In the Matter of the Assigned Estate of EDWARDS &
WIGGINTON ; GODDARD-PECK GROCERY Co. *et al.*,
Objectors, Respondents, v. JOHN J. MCCUNE,
Appellant.

47 307
122m428
47 307
64 678

St. Louis Court of Appeals, December 8, 1891.

1.  Insolvent Partnership: APPLICATION OF ASSETS TO THE PAYMENT
OF DEBTS OF A PARTNER. In the administration of the assets of an
insolvent partnership, the partnership creditors have a primary
and exclusive claim upon the assets. Nor can this rule of distri-
bution be defeated by any act, which the partners may concur in
doing when the firm is insolvent, or which they may concur in
doing in preparation for insolvency.

2.  ———— : ————. One member of a copartnership was individually
indebted for money contributed by him towards the capital of the
firm, and the note of the copartnership was, with the consent of
all the members, substituted for his own for the debt with the
aim of entitling the payee to participate in the distribution of the
partnership assets. The partnership was insolvent at the time,
or, even if not, was certainly made so by the assumption of this
debt, and shortly thereafter it made a voluntary assignment for
the benefit of its creditors. *Held*, that the transaction was invalid
as to partnership creditors, and that the claim should not be
allowed by the assignee against the partnership estate.

3.  Voluntary Assignments for the Benefit of Creditors :
APPEAL FROM ASSIGNEE : NATURE OF PROCEEDING. *Semble*, that if
an appeal is taken from the allowance by the assignee of a claim
against the assigned estate, the proceeding on such appeal is one
at law and not one in equity.

*Appeal from the Pike Circuit Court.*—HON. E. M.
HUGHES, Judge.

AFFIRMED.

*Fagg & Ball*, for appellant.

(1) It is insisted that there is no evidence of fraud
in this transaction. There is no proof that the firm

was insolvent at the time of the execution of the notes to McCune and Wigginton. The note to McCune was in part for the stock of goods with which Edwards was doing business at the time that E. B. Wigginton became a partner. The other note was for money borrowed by E. B. Wigginton with which he purchased half of the stock and the additional $300 put in for the purchase of new goods. (2) A partnership has the unquestioned right in the absence of any fraud to appropriate its property, money or credit to the extinguishment of the individual liabilities of the members of the firm. (3) The execution of the note to McCune and also the note to Calvin Wigginton on the first of July, 1889, was in each case a "novation," and in the absence of any fraudulent intent stands upon the same footing exactly as if these two debts had been actually paid with money or property belonging to the firm. *Sexton v. Anderson*, 95 Mo. 373, and the large number of cases cited by Judge BLACK in delivering the opinion of the court.

*J. D. Hostetter*, *E. W. Major* and *Eben Richards*, for respondents.

(1) The firm was insolvent July 1, 1889, and was made more so by the execution of the notes to McCune and C. Wigginton. (2) Creditors of an insolvent partnership have an equitable right to or a *quasi* lien upon the assets of the firm as against creditors of the individual partners. *Dunnica v. Clinkscales*, 73 Mo. 500; *Sexton v. Anderson*, 95 Mo. 373; *Phelps v. McNeeley*, 66 Mo. 554; *Huntley v. Farris*, 103 Mo. 781. Under the circumstances of this case the execution of the two notes in controversy was a fraud on firm creditors. (3) The making of these firm notes amounted to withdrawing firm property from firm creditors to the use of members of the firm, which can only be done when ample property is left to satisfy firm

liabilities. *Goodbar v. Cary,* 4 Woods, U. S. C. C. 663 ; *Wilson v. Robertson,* 21 N. Y. 537 ; *Menagh v. Whitwell,* 52 N. Y. 146 ; *Keith v. Finke,* 47 Ill. 272 ; *Prichett v. Pollock,* 82 Ala. 169.

THOMPSON, J.—John McCune presented, for allowance against the assigned estate of the partnership firm of Edwards & Wigginton, a promissory note made by said firm on the first day of July, 1889, for $2,000, payable one day after date to his order, and bearing interest from date at the rate of eight per cent. per annum. Calvin Wigginton also presented a note of the same date and tenor, for the sum of $1,926. The assignee allowed both of these notes, and certain other creditors of the firm appealed to the circuit court. The circuit court disallowed the notes, and from its judgment disallowing the note in favor of McCune this appeal is prosecuted. The case was by consent of parties submitted to the court without a jury, and no declarations of law were asked or given.

It appeared in evidence that the partnership firm of Edwards & Wigginton was formed in March, 1889, and made an assignment for the benefit of its creditors in July, 1890. The business was a retail grocery store. The basis of the business was a stock in trade owned by the appellant McCune, which McCune sold to Edwards, in 1887 for $2,600. When Edwards took Wigginton in as a partner, in March 1889, the stock was invoiced at between $3,300 and $3,400. They were to be equal partners, and the arrangement was such, that Wigginton purchased a half interest in the stock in trade and business for $1,626, and then each partner put into the business in cash the sum of $300. The indebtedness of Edwards to McCune was originally evidenced by three unsecured promissory notes, maturing respectively in six, twelve and eighteen months from date. Edwards had borrowed other money of McCune, and had made such payments that, on the first of July, 1889, the

indebtedness of Edwards to McCune stood at $2,000.
The $1,926 that Wigginton put into the firm, as above
stated, was entirely borrowed from his father, Calvin
Wigginton. Of this, $900 was in a note, due one day
after date and bearing interest at the rate of one per
cent. per annum; $500 was in a like note and the rest
not evidenced by any note. Thus it was that the inter-
est of each partner consisted entirely of borrowed capi-
tal; that Edwards still owed this claimant, McCune,
$2,000 for his interest in the partnership capital and
business, and that Wigginton for his interest therein
owed his father $1,926. We proceed on the view, that
what each partner had thus severally borrowed to pur-
chase his interest in the business was an individual and
not a partnership debt.

The firm seems to have lost money almost from the
start, and McCune, becoming uneasy, requested Edwards
to take up the individual notes of Edwards, held by
McCune, with the note of the firm. At the same time
Wigginton, Sr., thought that, if McCune was going to
get firm paper for the individual note of Edwards, he,
Wigginton, Sr., ought to have firm paper for what was
due him from his son, as already stated. It was accord-
ingly arranged between the partners and these individ-
ual creditors respectively, that the two creditors should
have firm paper; and on the first day of July, 1889, the
firm executed its note to McCune in settlement of the
individual notes of Edwards, and also its note to Wig-
ginton, Sr., in settlement of the individual debt of Wig-
ginton, Jr., to him.

The testimony leaves no room to doubt that this was
done in contemplation of a possible suspension, and the
avowed purpose of it was to put these individual cred-
itors, in the event of a suspension, on an even footing
with firm creditors. Edwards testified: "It was this
way: I had a great deal of sickness and had lost on
grain I had bought, and McCune insisted on some plan
of securing him. He was willing to aid us, tide over our

difficulties, if in any way to make him safe—to take joint note for the firm's note. I spoke to Wigginton, my partner, about it. He at the same time owed his father a like amount or very near it. He insisted that he would want to secure his father as well as John McCune; so we mutually agreed to give them the firm's note for the amount of each claim. Both of these notes were given at the same time." Further on, Edwards testified : "We gave a firm note so that, in case of death or failure, they should share and fare like all other creditors." On the same point the other partner Wigginton testifies :  " We saw the business was losing money —saw no prospect of times getting better, owing to competition on each side of us, and we did not care to favor one person and not others. We wanted to treat everybody alike." When the firm failed some six months later, its liabilities, including these two notes, footed up to about $5,600 ; its assets were inventoried at $3,149.95 ; but the assignee realized only the sum of $770 from the sale of the entire stock of goods under order of the court at public auction, and had succeeded in collecting only $70 of the $626 due the firm from its customers. Of these liabilities about $1,500 were due to merchants from whom it had bought goods.

No principle in law is better settled than the principle that in the administration of the assets of an insolvent partnership, the partnership creditors have a primary and exclusive claim upon the assets. This principle is so fully elaborated by Mr. Chief Justice SHERWOOD, in *Hundley v. Farris*, 103 Mo. 78, that we need do no more than refer to that one case. It is equally well settled that this rule of distribution cannot be defeated by any act which the partners may concur in doing when the firm is insolvent, or which they may concur in doing in preparation for insolvency. *Phelps v. McNeely*, 66 Mo. 554. A good deal of subtlety has been exhibited by the judges in tracing the foundation

of this principle, and much has been said about the equities of the partnership creditor being worked out through the equities of the partner.    This is mere casuistry.    The true reason is that the partnership property is deemed to be primarily the stake on which the partners secure their credit as a firm, and that this property ought to answer primarily for the debts which should be contracted on the faith of it.    " The basis of the rule," says Chancellor KENT, "is that the funds are to be liable on which the credit was given."   3 Kent, Com. 65 ; quoted in *Hundley v. Farris*, 103 Mo. 84. "The rule being, and the plain equities being," adds SHERWOOD, C. J., "that each estate must pay its own creditors."    *Hundley v. Farris*, 103 Mo. 85.   It is well settled that partners cannot defeat the operation of this salutary rule by making, while insolvent, or in the preparation for insolvency, *conveyances* of their firm assets to secure individual creditors, although both the partners may concur in so doing.    *Menagh v. Whitwell*, 52 N. Y. 146 ; *Phelps v. McNeely*, 66 Mo. 554. What the law will not allow them to do by giving a mortgage or a deed of trust of their partnership estate to their individual creditors, the law will not *aid* them in doing, when, for the same purpose, they have given their firm notes to take up their individual notes, by ordering distribution of their partnership assets, after insolvency to the individual creditors whom they have thus endeavored to promote to the status of partnership creditors.

The nature of the *debt* is not changed by the form of the note given under such circumstances.    Equity regards the substance and not the form.    The mere fact that the note is in form a partnership note does not make the debt a partnership debt for the purpose of a final distribution ; but, if it was given for an individual and not a partnership obligation, it may be treated, not as a partnership note, but as an individual joint note of

the partners, as was done in *Dunnica v. Clinkscales*, 73 Mo. 500.

The argument, which has been chiefly made in support of the right of this claimant to share *pari passu*, with the partnership creditors, is founded on the decision of the supreme court in *Sexton v. Anderson*, 95 Mo. 380. That case simply holds that, if all the partners concur in paying or securing an individual debt of one of them out of the partnership assets, while the firm is solvent, the transaction is not fraudulent in *law*. The court quotes the following expression of doctrine from a text-writer: "If one partner, *with the assent of the others*, sells firm property to his creditor to satisfy his private debt, and the transaction is *bona fide*, the title passes, and a partnership creditor cannot compel an application thereof on his debt, as there is nothing through which the equities of the firm creditors can work." 1 Call. Part. [Woods' Ed.] sec. 109, note 3. The court, speaking through Mr. Justice BLACK, adds: "With us each partner is liable for all the partnership debts. The partners may, so long as the firm exists, do with their property as they see fit. The firm creditors have no lien on the partnership property for the payment of their debts while the firm continues to exist. Partners have a right to have the partnership property applied to partnership purposes, but this is a right or lien which they may waive. Hence the great majority of adjudicated cases are to this effect, that all the partners may, by their joint act, dispose of partnership property in liquidation and payment of a debt owing by an individual member of the firm. The qualification is, that the transaction must be in good faith and not for fraudulent purposes." *Sexton v. Anderson*, 95 Mo. 381. But what is here meant by the qualification that the transaction must be in good faith, and not for fraudulent purposes? The meaning must necessarily be that the conveyance, made when the firm is insolvent, or in preparation for insolvency, the very purpose

of which is to defeat the rule of distribution established by the policy of the law, and to put the individual upon an equality with the partnership creditors in respect of the partnership assets, is not made in good faith and is fraudulent.

With the view of bringing the present case within the supposed principle of *Sexton v. Anderson, supra,* counsel for the appellant argues upon the evidence that the firm was not insolvent on the first of July, 1889, when the individual notes and debts of the partners were taken up by their joint or partnership notes. But this is immaterial, because they did it in avowed preparation for insolvency ; and besides, if the firm was solvent before they did it, the very act made it insolvent by swelling the firm debts to an amount much in excess of the value of the firm's assets. The conclusion is unavoidable upon this evidence that, if it is conceded that what they did had the effect of converting their individual debts into firm debts, then, by that very act, the firm became largely insolvent. For the purpose of fixing a fraudulent character to the act, an insolvency produced by the act itself stands on exactly the same footing as a precedent insolvency. This was the view taken by the New York court of appeals, where, reviewing a finding of the supreme court that the firm was solvent when the partners gave mortgages of firm property to secure individual debts, RAPALLO, J., said : "We cannot concur in this view of the effect of the findings, but think that the facts found show that the firm was insolvent when the mortgages were given ; and, if there were any doubt upon that point, they clearly establish that the diversion of four-fifths of its properties to the individual debts of two of the partners would make it insolvent." *Menagh v. Whitwell,* 52 N. Y. 153. We may equally say on the record before us that, if there were any doubt as to the insolvency of this firm on the first of July, 1889, the shouldering upon the firm

of individual debts, equal in value to its entire assets, would make it insolvent.

We have treated this case as though we had the power to deal with the evidence as in a case in equity. The parties, in waiving a jury in the court below, seem to have regarded it as a case at law, triable by a jury. The statute merely enacts that the circuit court, "should proceed to hear and determine the same, in the same manner as if said case were in said court by appeal from the judgment of a justice of the peace." An appeal from an order allowing a claim against the estate of a deceased person in the probate court is, by force of statute, triable on the same principles as appeals from justices, and would be triable by a jury in the circuit court ; and such by analogy, would have been the regular mode of trial in this court. Treating it as a case at law, we could not disturb the judgment on any theory of appellate procedure ; because the circuit court may have based its judgment, rejecting the claim, on the finding that the firm was actually insolvent when the notes were given, a conclusion not unwarranted by the evidence. But this is not material, because our view would be the same if we were authorized to deal with it as chancellors.

The judgment will be affirmed. All the judges concur.

But one of the judges of the court being of opinion that this decision is opposed to the decision of the supreme court in *Sexton v. Anderson*, 95 Mo. 373, it is ordered that this cause be certified to the supreme court for final determination in conformity with the constitutional mandate.*

---

* SUPPLEMENTAL MEMORANDUM.—The judges direct the reporter to state that, since the foregoing opinion was filed, the attention of the members of the court has been called to the decision of the supreme court in *Reyburn v. Mitchell*, 16 S. W. Rep. 592 ; *Seger v. Thomas*, 18 S. W. Rep. 33, which seems to furnish an additional reason for certifying this case to the supreme court.